## STATE OF CONNECTICUT *v.* ANDREW BELIVEAU
### (15196)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

Argued January 9—officially released July 9, 1996

*Martin Zeldis*, assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Dennis O'Connor*, assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant was convicted, after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1)[1] and sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A).[2] The Appellate Court affirmed the defendant's convictions. *State* v. *Beliveau*, 36 Conn. App. 228, 650 A.2d 591 (1994). We certified the following issues for appeal: (1) "Was the Appellate Court correct when it held that the defendant's right to confrontation was not violated when the trial court refused to allow cross-examination of the victim and the police officer who took her statement regarding the complaint against the defendant she made to the police?"[3] (2) "Was the

---

[1] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-72a provides in relevant part: "(a) A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[3] In light of the briefs and oral arguments of the state and the defendant, it appears that the first certified issue is overly broad. Both the state and the defendant agree that cross-examination of the victim and the officer who took the victim's written statement was restricted only insofar as the victim's written statement pertained to an alleged sexual incident between

Appellate Court correct when it held that the testimony of two police officers which was admitted into evidence, over objection of the defendant on hearsay grounds, was not error because the trial court in its charge merely instructed the jury not to consider their testimony for purposes of constancy of accusation?" and (3) "Was the Appellate Court correct when it refused to review the defendant's claim that the trial court had improperly failed to inform the defendant of the extent to which an agency complied with a subpoena of the victim's counseling records when it conducted an in camera inspection of those records?" *State v. Beliveau*, 232 Conn. 910, 654 A.2d 354 (1995). We affirm the judgment of the Appellate Court.

The Appellate Court concluded that the jury reasonably could have found the following facts. "At 11 p.m. on July 19, 1991, the nineteen year old victim began working her shift at the Cumberland Farms located at the intersection of Routes 4 and 69 in Burlington. She was scheduled to finish her shift at 7 a.m. the next day. The defendant, Andrew Beliveau, had been the store manager for approximately one month and was the victim's supervisor.

"At about 2:30 a.m. on July 20, the defendant arrived at the store while the victim was working her shift. When he arrived, two customers were in the store, both of whom were known to the victim. The defendant told the two customers that they had to leave the premises and they did.

"When the two customers left the store, the defendant locked the door and put out a sign indicating that the

the victim and a former store manager. At trial, the defendant was permitted broad latitude in the cross-examination of the victim and the officer regarding the complaint concerning the defendant but was not permitted to cross-examine regarding the prior encounter with the previous store manager. Our review is therefore necessarily limited to the actual restriction on cross-examination that occurred in the trial court.

store would be closed for one-half hour. He then began to mop the floor to strip it of wax. The defendant stopped his work and went to a room in the rear of the store. He called the victim to come to that room and, when she responded, he requested that she hold a ladder so that he could climb up into a loft located above a large cooler. The victim complied with his request and the defendant climbed the ladder, holding a flashlight, and entered the loft. The victim then returned to the main part of the store to clean the coffeemaker.

"The defendant again called for the victim to come to the back room. This time he asked her to climb the ladder to the loft and assist him in removing two pieces of sheetrock that were blocking a surveillance mirror located above the cooler. She complied with his request and climbed the ladder and entered the loft.

"When the victim entered the loft, she noted that the only source of light was the flashlight that the defendant had carried up to the loft. She went to the area where the mirror was located and she and the defendant proceeded to remove the two pieces of sheetrock from the wall. The defendant and the victim were on their hands and knees because the ceiling in the loft was low and they could not stand. The defendant told the victim that he wanted to place a surveillance camera behind the mirror because he thought that inventory was being stolen and he hoped that with the use of a camera he would be able to detect the parties that were stealing from the store.

"The defendant asked the victim to look through the mirror to the store below in order to help him determine the best angle at which to place the camera. In order to do so, the victim had to lie down on her right side. The defendant then crawled toward her, positioned himself on top of her and kissed her. She told him to stop and backed as far away from him as possible.

Despite her protestations, the defendant continued to kiss her. The defendant then put his hand under the victim's shirt and touched her breast. She again asked him to stop. The defendant instead lifted her shirt, unhooked her brassiere and began to kiss her breasts. Again the victim told him to stop, but despite those repeated requests, the defendant continued this course of conduct.

"The defendant pushed the victim's shoulder and forced her onto her back on the floor of the loft. The defendant removed the victim's sneakers and unbuttoned and unzipped her jeans. He then proceeded to pull her jeans down. During this time the victim continued to protest, demanding that the defendant stop. The defendant removed the victim's jeans.

"The defendant moved on top of the victim and forced her legs apart with his legs. He then inserted his penis into the victim's vagina. After several minutes, the defendant withdrew and ejaculated on one of the pieces of sheetrock that had been removed from the mirror area. The defendant arose, put on his underpants and trousers that he had removed prior to his assault on the victim, and left the loft.

"About five minutes later, the victim dressed and returned to the store area. She made coffee and used a napkin that was lying near the coffee machine to dry her tears so that she could reopen the store. The victim did not see the defendant for the remainder of her shift, nor did she call the police at that time." *State* v. *Beliveau*, supra, 36 Conn. App. 230–32.

The record also reveals that the victim returned to work on Monday evening, July 23. During her shift, the victim spoke with Trooper Lucian St. Germain of the Connecticut state police who had come into the store to purchase a few items. The victim told St. Germain that she had experienced problems with the defendant

because the defendant had asked her to join him in a back room of the Cumberland Farms store and had then threatened to blame her for several recent in-store thefts if she did not "do it" with him. At that point, a customer entered the store and St. Germain was unable to learn any more details from the victim. St. Germain testified that the victim had questioned him about the possibility of obtaining a weapon to be used in self-defense and that her usually cheerful demeanor had been replaced by a "blank" expression on the evening that he had spoken with her. At some point after speaking with St. Germain, the victim also spoke with Trooper Karl Golden, Jr., at the Cumberland Farms store. The victim complained to Golden that the defendant had assaulted her sexually.

The Appellate Court also indicated that the jury reasonably could have found the following additional facts. "On the evening of July 23, 1991, or early on July 24, Officer Peter Fernald of the Burlington police department came into the Cumberland Farms store as part of his scheduled patrol. He had been notified by St. Germain that the victim was having problems with the defendant and noticed that the victim appeared upset. He questioned her to determine what had happened, and the victim indicated that her problem concerned the defendant. The victim then began to relate to him the events of July 20, 1991. The victim became upset and Fernald decided to have a female trooper dispatched to the scene.

"Later that morning, Fernald returned to the store accompanied by Trooper Christine Terlecky of the Connecticut state police. At that time, the victim recounted in greater detail the events that had occurred at the store on July 20. The victim was then taken to the Troop L barracks in Litchfield, where she gave a fully detailed written statement as to what had occurred between her and the defendant." *State* v. *Beliveau*, supra, 36 Conn.

App. 233. Additional facts will be recited as necessary to address the questions presented.

## I

The defendant first asserts that he was denied his constitutional right to confrontation[4] because the trial court did not allow him to cross-examine the victim and Terlecky regarding a specific portion of the victim's written statement to Terlecky. The Appellate Court concluded that the trial court's exclusion of cross-examination into that aspect of the victim's written statement was not improper because the line of questioning sought to be pursued by the defendant was irrelevant. We agree with the Appellate Court.

The Appellate Court recited the following additional facts. "On July 24, 1991, the victim gave a detailed statement regarding the sexual assault to Terlecky at the Troop L barracks in Litchfield. The victim's statement to the police consisted of five pages, the first one and one-quarter pages of which related her experience with a former manager of Cumberland Farms, the defendant's predecessor. The victim alleged that the former manager had made sexual advances toward her, which she rebuffed.

"At trial, the defendant attempted to cross-examine the victim regarding her problems with the former manager. The state objected to the line of questioning, claiming that it was irrelevant, that it violated the rape shield laws, and that it exceeded the scope of direct examination. The trial court sustained the state's objection on the ground of relevancy.

"Later in the trial, the state offered the testimony of Trooper Karl Golden, Jr., of the Connecticut state

---

[4] The defendant has not provided an independent analysis under the state constitution. We therefore confine our analysis to a discussion of his rights under the federal constitution. See *State* v. *Vincent*, 229 Conn. 164, 168 n.5, 640 A.2d 94 (1994).

police. Golden testified that he had spoken with the victim on an unspecified date in July, 1991. At that time, the victim informed him that she was having problems of a sexual nature with an unnamed supervisor. She indicated that this unnamed supervisor was her present manager.

"After the state's direct examination of Golden, the defendant requested argument to the court. The defendant claimed that Golden's testimony could have concerned the incident between the victim and the former manager, and that he should be permitted to recall the victim or question Terlecky about the entirety of the victim's statement to the police, including that portion of the statement that dealt with the victim's encounter with the previous store manager. The trial court indicated that it would rule on those issues at the time that they were raised.[5]

---

[5] The transcript of the trial reveals the following colloquy with regard to the defendant's claim concerning the testimony of Golden:

"[Defense Counsel]: Your Honor, may I address the court relative to Trooper Golden's testimony just now.

"The Court: The redirect?

"[Defense Counsel]: The testimony in general. That the testimony of Trooper Golden is that a person unspecified, who is a manager, or sometime in July was a manager, or it happened sometime in July, the manager is probative of—to Your Honor's ruling of yesterday relative to the information regarding [the former manager]. And the complaint that she made relative to [the former manager] apparently was as to an incident that happened mid-July or thereabouts. She said in her statement two weeks prior to the time she made her statement; I believe, that she made her statement on the twenty-fourth or the twenty-fifth of July; and so, that would put it sometime around, I guess, the tenth or eleventh of July, that this incident apparently happened with [the former manager]. And there's no way of knowing whether or not the complaint is as to [the former manager], or if it is as to [the defendant]. So, I think, that opens up the door to anything relative to [the former manager] being presented. I'm suggesting that perhaps the victim needs to be called back to the stand relative to . . . . And so, I just wanted to alert the court that it is our position that that opens up the door to that information coming in at some further time—well, at least that would be our position. . . . Well, I believe that this opens the door. And since I really don't have anything specific, my intention would be, and I'll just alert the court, my intention would be at the time that I believe that Officer Terlecky

"Prior to Terlecky's taking the stand, the defendant again argued that he should be able to cross-examine her regarding the first one and one-quarter pages of the victim's statement to the police. His request was again denied on the ground of relevancy. The defendant did not attempt to recall the victim." *State* v. *Beliveau,* supra, 36 Conn. App. 233–37. The defendant claims that the preclusion of cross-examination concerning the initial one and one-quarter pages of the victim's statement impaired his constitutional right to confrontation. We are unpersuaded.

Our analysis of the defendant's claim is guided by the familiar constitutional guidelines relevant to cross-examination by the defendant in a criminal trial. "It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas,* 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) . . . . The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy,* 360 U.S. 474,

---

testifies, and she's the person who, I believe, took the statement of [the victim]. I would at that time renew my position because I would intend to ask her questions relative to the complaint against [the former manager].

"The Court: Well, as to your future questions for future witness[es], I'll leave that for another time. . . .

"The Court: Okay. And as far as the testimony that I have, the only reasonable and logical inference that the jury could make, if they find the witnesses credible, is that the victim—the alleged victim, is talking about the current manager on or about July twentieth.

"[Defense Counsel]: Well, I will probably pick that up when we get to Trooper Terlecky's testimony."

496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985). In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, [supra, 318]; *State* v. *Lubesky*, supra, 482. . . .

"The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. *State* v. *Johnson*, 21 Conn. App. 291, 293, 573 A.2d 1218 (1990). Only relevant evidence may be elicited through cross-examination. *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 479 (1980). The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . *State* v. *Kelly*, 208 Conn. 365, 376, 545 A.2d 1048 (1988). . . . *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994)." (Internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 745–46, 657 A.2d 611 (1995).

The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. Id., 746–47; *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 569, 657 A.2d 212 (1995); *State* v. *Kelley*, supra, 229 Conn. 563; *State* v. *Hernandez*, 224 Conn. 196, 208, 618 A.2d 494 (1992); *State* v. *Willis*, 221 Conn. 518, 522, 605 A.2d 1359 (1992); *State*

v. *Holliman*, 214 Conn. 38, 50, 570 A.2d 680 (1990);
*State* v. *Parker*, 197 Conn. 595, 601, 500 A.2d 551 (1985).

The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. *State* v. *Barnes*, supra, 232 Conn. 747; *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 571; *Hall* v. *Burns*, 213 Conn. 446, 452, 569 A.2d 10 (1990). Relevance may be established in one of three ways.

First, the proffering party can make an offer of proof. See *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994); *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986). Second, the record can itself be adequate to establish the relevance of the proffered testimony. See *State* v. *Santiago*, 224 Conn. 325, 332, 618 A.2d 32 (1992); see also *State* v. *Pittman*, 209 Conn. 596, 602–605, 553 A.2d 155 (1989); *State* v. *Hackett*, 182 Conn. 511, 517–20, 438 A.2d 726 (1980). Third, the proffering party can establish a proper foundation for the testimony by stating a "good faith belief" that there is an adequate factual basis for his or her inquiry. "A good faith basis on the part of examining counsel as to the truth of the matter contained in questions propounded to a witness on cross-examination is required." 1 C. McCormick, Evidence (4th Ed. 1992) § 49, p. 187. A cross-examiner may inquire into the motivation of a witness if he or she has a good faith belief that a factual predicate for the question exists. See *United States* v. *Peterson*, 808 F.2d 969, 978 (2d Cir. 1987); *State* v. *Barnes*, supra, 232 Conn. 747. The defendant has failed to persuade us that he had established the relevance of the proposed line of questioning in the trial court by any of these methods.

The defendant's argument in support of the relevance of that portion of the victim's written statement pertaining to the incident with the former manager con-

sisted only of unsubstantiated speculation by the defendant concerning the claimed psychological under-pinnings of the victim's complaint against the defendant and was insufficient to establish the relevance of the proposed cross-examination.[6] In the typical case in

---

[6] The defendant provided the following argument in support of his claim of relevance:

"[Defense Counsel]: . . . I would maintain that an event or an incident with a former manager, [the defendant is] the current manager, [an] incident with a former manager, and an incident that's similar in nature to the accusation being made here, is extraordinarily relevant to the question of whether or not there's any transference of any beefs or any problems that she had with [the former manager]. . . . Our contention in part is, and our defense is in this case, that it is consensual sex. It only became nonconsensual sex in her mind, in the victim's mind, as she started considering how she was being abused by managers or former managers, or how she was being treated by managers, or former managers of Cumberland Farms. And that does have an impact on whether or not initially at the time that this all happened, it was a consensual act.

\* \* \*

"The Court: I have a problem with your first issue about relevancy. How is that going to assist the trial? What if de facto, [the former manager] made advances?

\* \* \*

"[Defense Counsel]: My response is that there is a link here and the link is to me quite clear. It's not a matter of has this event happened a long time ago, and the question is consent. Now, the question of consent especially in the fact[s] as they have been so far presented, and are before the court, the question of consent is going to be a perceptual one. And as a perceptual question, the trier of fact and the court is going to be a—is going to be benefited by what—again, I really would like the witness to step down because I don't—

"The Court [addressing the victim]: Okay. I'm going to ask you to step down just momentarily. Just go into the hallway momentarily please . . . .

"[Defense Counsel]: The question of consent as a perceptual question is going to [be] something the jury is going to struggle with in deciding; and how you decide, whose perceptions are true perceptions, and whose perceptions are not true perceptions is going to be by hearing evidence surrounding this—people who saw this witness afterwards. People who had contact with this witness before. And one of the things, especially since she ordained it to be the most important thing in that she said first off what had happened with the former manager, I think, that it is probable that some of her problem with [the defendant] perhaps is really a problem with [the former manager]. And that the question of whether or not what happened between [the defendant] and the witness, and the question of whether it was consensual or not

which a defendant charged with sexual assault seeks to cross-examine the victim regarding a prior complaint of sexual misconduct made by the victim against another, the defendant must establish that the prior complaint was false. *State* v. *Kelly*, supra, 208 Conn. 377. The defendant's claim in this case, however, is not that the complaint against the former manager is relevant because it demonstrates that the victim has a propensity for making false complaints of sexual misconduct. Rather, the defendant claims that the incident

is impacted upon her beliefs. Now, if she felt—my goodness, this is what happens to me, I get taken advantage of by Cumberland Farms store managers. A new guy comes on, he's not different than the old guy. I give him sex and then he goes away, and he doesn't want anything to do with me, and blah, blah, blah! That's going through her head.

"The Court: But where does [the former manager] fit in?

"[Defense Counsel]: [The former manager] fits in because after—after the sexual intercourse between [the defendant] and the witness, afterwards—afterwards she spends four days before she decides, as a matter of fact, two and a half days out, she says to the officer she testified to, I don't know if it was rape. Two and a half days out, she's still saying, I don't know if it was a rape. What I'm saying is that it was possible if not probable, that what she was doing was stewing for three or four days about what happened to her with [the defendant]. It wasn't a nonconsensual act at the time that it happened. It became a nonconsensual act as she stewed about it and thought, hey this is a pattern. The pattern is the same as it was before. I got a new manager. I got the same kind of situation coming up, and I don't know if I'm real comfortable with it. That isn't rape though. That is a consensual act that later on she decides is a nonconsensual act.

"The Court: Well, I'll certainly let you get into whether or not she consented. But, Mr.—

"[Defense Counsel]: Well, if I might, Your Honor?

"The Court: Yes, sir.

"[Defense Counsel]: Letting me get into that entails letting me get into what was going on in her mind, and that would include, I submit, the very recent act, or activity, that she had with [the former manager] which is not a sexual act. Now, as a matter of fact, it really gets almost no place. But it could certainly be construed by the person who it's happening to as a sexual type advance.

\* \* \*

"The Court: . . . I don't see the relevancy. I understand [defense counsel's] argument, but I don't see the relevancy for the jury in this particular case under what has been proffered. So I'm going to sustain the objection to the question. You may have an exception."

with the former manager is relevant on the basis of the defendant's unsubstantiated speculation that there may have been some "transference of any beefs or any problems" that the victim had with the former manager to the defendant.

The defendant's "transference" theory finds its origin and sole support in the fact that the victim included a description of a previous encounter she had experienced with a former store manager in her written statement to Terlecky. The defendant argued in the trial court and claims on appeal that because the victim included an account of a former store manager's attempt to kiss her in her statement concerning the sexual assault by the defendant, the two incidents must be linked together somehow in her mind. We are unconvinced that the cognitive link between the two incidents is so apparent from the victim's statement that its relevance could be established without any further offer of proof. See *State* v. *Santiago,* supra, 224 Conn. 332; see also *State* v. *Pittman,* supra, 209 Conn. 602–605; *State* v. *Hackett,* supra, 182 Conn. 517–20. Moreover, the defendant exhibited no more information or knowledge concerning the working of the victim's mind than that which the court itself could glean from the victim's statement. Consequently, the defendant could not establish the relevance of the proposed cross-examination simply by stating that he had a "good faith belief" that there was an adequate factual basis for the inquiry. See *State* v. *Barnes,* supra, 232 Conn. 747. As a result, it was incumbent upon the defendant to make an offer of proof of some kind demonstrating the relevance of the incident with the former manager. In this case, such an offer could have consisted of a voir dire of either the victim or the police officer who took her complaint to establish the validity of the defendant's supposition that the incident with the former manager had some effect on the victim's assessment of the events that had

transpired between her and the defendant.[7] Because there was no such offer of proof, we conclude that the trial court did not abuse its discretion by denying the defendant the opportunity to cross-examine the victim and Terlecky regarding the incident with the former manager.

## II

We next consider whether the Appellate Court was correct when it concluded that the admission by the trial court of the testimony of St. Germain and Golden was not improper.[8] During the state's case-in-chief, four police officers testified, with varying degrees of detail, as to what the victim had told them had occurred between her and the defendant. The defendant objected to the testimony of two of the officers, St. Germain and Golden, on hearsay grounds. The trial court overruled the defendant's hearsay objections and admitted the troopers' testimony under the constancy of accusation doctrine.[9] During its charge, the court explained the constancy of accusation doctrine to the jury and instructed the jury that the testimony of the four officers was constancy of accusation testimony. After the jury had been excused, the defendant objected to that portion of the court's instructions, arguing that the testimony of St. Germain and Golden was not constancy of

[7] It appears from the record that if the defendant had inquired into the circumstances surrounding the inclusion of the facts pertaining to the former manager in the victim's statement, he would have learned that the decision to include those facts at the beginning of the victim's statement had been made by Terlecky rather than by the victim. Such a revelation would have undermined significantly the defendant's transference theory.

[8] We need not address the Appellate Court's alternate grounds for affirmance, namely, that the trial court, in its reinstruction of the jury, had excluded the testimony of St. Germain and Golden from consideration by the jury; State v. Beliveau, supra, 36 Conn. App. 240; and that any error in admitting the testimony would have been harmless. Id., 241 n.8.

[9] The validity of the constancy of accusation doctrine itself is not at issue in this appeal. See State v. Troupe, 237 Conn. 284, 293–306, 677 A.2d 917 (1996) (prospectively modifying constancy of accusation doctrine).

accusation testimony. In order to remedy this perceived error, the defendant proposed that the trial court either delete the names of all those who had testified concerning constancy of accusation and let "the [jury] decide" which evidence was constancy evidence or "delete the two names of people we contend did not offer constancy testimony, because their testimony was not of accusation, at least, certainly not as to any accusation of sexual assault." The court accepted the latter recommendation and reinstructed the jury that the constancy charge was "only relevant to two [witnesses]—Constable [F]ernald and Trooper Christine Terlecky. Not the other troopers because it's my recollection—it's yours that controls—that she said nothing to them of the actual sex situation." We conclude that the trial court properly admitted the testimony of St. Germain and Golden as constancy of accusation testimony. Consequently, the defendant cannot prevail on his claim that the court's supplemental jury instruction was insufficient to remedy the allegedly improper introduction of the troopers' testimony.[10]

The following additional facts are necessary to our resolution of this issue. On direct and redirect examination by the state, St. Germain testified to the following facts: On July 23, 1991, at 12:30 a.m., he had gone to the Cumberland Farms store where the victim was a cashier for the purpose of buying a newspaper and a few other items. While in the store, he had a conversation with the victim. During the conversation, he informed the victim that there would be no state trooper working in Burlington that evening. At that point, the victim appeared concerned and St. Germain inquired

---

[10] We need not decide, therefore, the import of the fact that the trial court reinstructed the jury in the precise manner requested by the defendant. See *State* v. *Prioleau*, 235 Conn. 274, 294, 664 A.2d 743 (1995) (defendant may not request instruction and then claim on appeal that it should not have been given).

as to the cause of her concern. The victim questioned St. Germain about the possibility of obtaining a weapon to use in self-defense. She then explained to St. Germain that she had been having problems with the defendant. More specifically, she told St. Germain that in the early morning hours of July 20, the defendant had locked the store, mopped the floors and then had asked her to go to a back room of the store with him. When she joined him in the back room, he told her that if she did not "do it" with him, he would blame her for several recent thefts at the store. St. Germain testified that his conversation with the victim was interrupted at that point when a customer entered the store. The court overruled the defendant's hearsay objection to this testimony and admitted it under the constancy of accusation doctrine.

At the conclusion of St. Germain's testimony, the state called Golden to the stand. Golden testified that in July, 1991, he had spoken with the victim at the Cumberland Farms store and that during the conversation the victim had made a complaint regarding a sexual assault by the defendant. Golden testified that the victim was unable to discuss the incident in detail with him at that time because there were customers in the store, but that she had revealed to him that the defendant had touched her "intimate parts." The defendant's hearsay objection to Golden's testimony was overruled.

We begin by noting that whether evidence is admissible under the constancy of accusation doctrine is an evidentiary question that " 'will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice.' " *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990); *State* v. *Hernandez*, 204 Conn. 377, 390, 528 A.2d 794 (1987). The defendant has demonstrated neither that it was an abuse of discretion for the trial court to admit the testimony of St. Germain and Golden,

nor that he was substantially prejudiced by their testimony.

The defendant appears to argue that the complaints made to St. Germain and Golden were not sufficiently specific regarding the details of the offense to be admitted under the constancy of accusation doctrine. We are unaware, however, of any cases in which we have held that a complaint of sexual assault needs to reveal every disturbing detail of the crime in order for the existence and substance of that complaint to be admissible under the constancy of accusation doctrine. "Constancy of accusation evidence is admissible 'when the complainant first has testified, in court, to the facts of the alleged occurrence . . . . She is then permitted to state that she made that complaint to some other person. Thereupon, the person to whom she complained, out of court and in the absence of the defendant, is permitted to testify not only to the fact that a complaint was made but as to its details.' . . . *State* v. *Segerberg*, [131 Conn. 546, 548–49, 41 A.2d 101 (1945)]." *State* v. *Kelley*, supra, 229 Conn. 565. So long as the victim has testified to the occurrence of a sexual assault and identified those to whom she has reported the assault, those persons may testify as to the substance of their conversations with the victim regarding the alleged sexual assault. This testimony is admissible for the limited purpose of ascertaining the credibility of the victim's own testimony. *State* v. *Rodgers*, 207 Conn. 646, 649, 542 A.2d 1136 (1988); *State* v. *Pollitt*, 205 Conn. 61, 76, 530 A.2d 155 (1987); *State* v. *Dabkowski*, 199 Conn. 193, 199, 506 A.2d 118 (1986). Once the evidence of the complaints is admitted and the witnesses thereto are cross-examined by the defendant, it is a factual question for the jury to determine whether those complaints support or contradict the victim's in-court testimony. See *State* v. *Brigandi*, 186 Conn. 521, 530–31, 442 A.2d 927 (1982) (untimely nature of complaints and inconsistency

among accusations are issues to be considered by jury when assessing victim's credibility, not factors affecting admissibility under constancy of accusation doctrine). We are persuaded that it was entirely appropriate for the trial court to admit the victim's complaints to St. Germain and Golden under the constancy of accusation doctrine. That the trial court in the exercise of an over-abundance of caution attempted to accommodate the defendant's objection and charged as the defendant requested is immaterial.

Moreover, the defendant has not established that the admission of the troopers' testimony caused him substantial prejudice. *State* v. *Alvarez*, supra, 216 Conn. 306. In fact, if anything, the inclusion of the more general complaints of the victim to St. Germain and Golden buttressed the defendant's theory of defense that what had begun as a consensual sexual act between him and the victim had gradually been transformed, after several conversations with the police officers, into a sexual assault. During closing argument, the defendant twice argued to the jury that the evidence presented by the four police officers represented "constancy of non-accusation" in that the victim had made extremely general, nonspecific comments to both St. Germain and Golden. According to the defendant, it was only after several police officers repeatedly questioned the victim that she specifically claimed that she had been sexually assaulted. Without the testimony of St. Germain and Golden, the defendant's "constancy of nonaccusation" argument would have been considerably weakened. As we have noted in the past, the constancy of accusation doctrine can provide a defendant with a great deal of helpful information and is fertile ground for cross-examination. *State* v. *Kelley*, supra, 229 Conn. 566; *State* v. *Dabkowski*, supra, 199 Conn. 202. In this case, the defendant used the testimony of St. Germain and Golden to his advantage and cannot now claim that he

likely would have been acquitted had that testimony not been admitted. In sum, we conclude that the trial court did not abuse its discretion in admitting the testimony of St. Germain and Golden. We also conclude that the defendant was not substantially prejudiced by the admission of the troopers' testimony.

### III

Finally, we must decide whether, as the Appellate Court held, the record is inadequate to review the defendant's claim that the trial court improperly failed to inform him of the nature of confidential psychological records submitted to it by a mental health agency in response to a subpoena. The following facts are necessary to resolve this issue. Pursuant to the defendant's subpoena, confidential records were sent to the trial court by the Susan B. Anthony Center (center) in Torrington, where the victim had received rape crisis counseling. The subpoena had commanded the keeper of the records at the center to deliver to the court "[a]ny and all counseling and/or mental health records of [the victim] from January 1, 1991, to the present time including documents and all other materials." On the outside of the sealed envelope delivered from the center to the trial court, the keeper of the records had written, "subpoenaed materials for Judge Miano—confidential." Inside the sealed envelope were twenty-one pages of records from the center. With the victim's consent, the trial court reviewed the records in camera. After reviewing the sealed records, the court informed counsel that it had "found nothing whatsoever that [was] relevant to this matter." The court then ordered that the records be resealed and preserved for appellate review.

While the case was pending on appeal, the trial court unsealed the subpoenaed records, with the victim's and the state's consent, in order to allow defense counsel

to review the records for purposes of appeal.[11] A review of the records revealed to the defendant that the material sent by the center consisted of two intake forms, one of which provided a summary of the victim's version of the incident with the defendant, and nineteen pages of attendance records that included the dates upon which the victim received counseling, the general notes regarding the nature of the counseling, the length of each counseling session and the initials of the counselor.

The defendant now claims that "it is probable that the [center] failed to fully comply with his subpoena to provide all of [the victim's] counseling records." On the basis of this speculative assertion, the defendant seeks a remand to the trial court for a determination of whether the center complied with his subpoena. The defendant has, however, produced nothing to give us any reason to believe that there has not been full compliance with his subpoena. We acknowledge that the defendant could not have made the necessary record at the trial stage because the nature and content of the material sent in response to his subpoena did not become known to him until after the trial had been completed. There is no reason, however, that the defendant could not have filed a petition for a new trial under General Statutes § 52-270[12] and Practice Book

---

[11] We note that mental health records such as the victim's in this case normally remain sealed throughout the appellate process in order to preserve the confidentiality interests embodied in General Statutes § 52-146e. *In re Christopher G.*, 20 Conn. App. 101, 110 n.6, 564 A.2d 619 (1989), cert. denied, 213 Conn. 814, 569 A.2d 549 (1990); see *State* v. *Kelly*, supra, 208 Conn. 377–81 (victim's psychiatric records remained sealed throughout appeal).

[12] General Statutes § 52-270 provides: "Causes for which new trials may be granted. (a) The superior court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, or for other reasonable cause, according to the usual rules in such cases.

§ 904[13] in order to provide us with a factual record. In fact, § 904 specifically provides that such a petition may be filed and granted during the pendency of an appeal. A new trial would have been appropriate in this instance if the trial court had determined that there had been noncompliance with the subpoena and that there existed a reasonable probability that the disclosure of new evidence derived from full compliance would have affected the outcome of the trial. *Demers* v. *State*, 209 Conn. 143, 162, 547 A.2d 28 (1988). At the hearing on such a motion, the defendant would have had an opportunity to supplement the record for our review by questioning a representative of the center about the nature of its record keeping practices. We decline to remand this case to the trial court solely on the basis of the defendant's unsupported speculation that the center may have failed to comply fully with his subpoena, that the center may have more detailed records than those provided to the defendant[14] and that those hypothetical records may have affected the outcome of the trial.

The judgment is affirmed.

In this opinion PETERS, C. J., and NORCOTT and PALMER, Js., concurred.

The judges of the superior court may in addition provide by rule for the granting of new trials upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of an action.

"(b) An affidavit signed by any party or his or her attorney shall be presumptive evidence of want of actual notice."

[13] Practice Book § 904 provides: "Time for Filing Motion Based on Newly Discovered Evidence

"A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with Gen. Stat., 52-270. The judicial authority may grant the petition even though an appeal is pending."

[14] In fact, many such counseling centers do not keep detailed therapeutic records. See *State* v. *Pierson*, 201 Conn. 211, 220, 514 A.2d 724 (1986) (rape counseling center followed policy of minimal record keeping), on appeal

BERDON, J., dissenting. This criminal prosecution for sexual assault was not an open and shut case. The jury deliberated for three days. After the second day of deliberations, the jury informed the court that they were at an impasse with no apparent possibility of reaching a unanimous decision. Only after the jury was given the powerful "Chip Smith"[1] instruction, which

after remand, 208 Conn. 603, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989).

[1] Jury instructions that encourage jurors to reach a verdict similar to the Chip Smith charge; *State* v. *Smith,* 49 Conn. 376, 386 (1881); like its federal counterpart, the *Allen* charge; *Allen* v. *United States,* 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896); have been criticized as inherently coercive in that they are imbalanced in favor of the majority position. *People* v. *Gainer,* 19 Cal. 3d 835, 566 P.2d 997, 139 Cal. Rptr. 861 (1977); *Burnette* v. *State,* 280 Md. 88, 371 A.2d 663 (1977); *Kersey* v. *State,* 525 S.W.2d 139 (Tenn. 1975); 75B Am. Jur. 2d 351, Trial § 1589 (1992). "Many courts have abandoned *Allen*-type charges in favor of a standard instruction recommended by the American Bar Association, which provides:

" 'The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

" 'It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, for the mere purpose of returning a verdict.' " 75B Am. Jur. 2d, supra, 352–53.

In this case, the court instructed the jury with the following version of the charge: "Ladies and gentlemen: As was indicated to me yesterday afternoon when I read your last note into the record, it's been brought to our attention that you've been unable to—so far, to agree upon a verdict, and as you know, your verdict must be unanimous.

"In order to provide you with some assistance, I want to give you some further instructions regarding your responsibilities during your deliberations.

"Each juror must, of course, reach his or her own conclusion after an impartial consideration of the evidence. No jury should surrender his or her honest conviction solely because of the opinion of their fellow jurors and merely for the sake of returning a verdict. Jurors, however, have a duty to consult with one another. To pay proper respect and give due regard in deference to the opinions and arguments of each other, and jurors have an

urges that those jurors in the minority listen to the majority, did the jury, several hours later, return its guilty verdict.

The only issue that I would reach in this case is whether the defendant Andrew Beliveau's federal constitutional right to confrontation was violated when the trial court refused to allow him to cross-examine Ms. C, the alleged victim, and Christine Terlecky, the state police officer who took her statement, with respect to the entire statement Ms. C gave to the police accusing the defendant of sexual assault. In my view, the failure to allow the defendant to cross-examine the witnesses on the entire statement deprived him of his sixth amendment right to confrontation. To appreciate the constitutional violation suffered by the defendant, the issue must be viewed in the context of the facts of this case, which are not fully stated by the majority.

The credibility of Ms. C was of vital importance in this case. The defendant was a manager of a Cumberland Farms convenience store located in the town of Burlington. Ms. C was an employee at that store who worked the night shift between 11 p.m. and 7 a.m. The defendant testified that he had consensual sex in the

obligation to deliberate with a view toward reaching a verdict—excuse me, to reaching an agreement.

"*Any juror among you who holds a minority opinion* should carefully consider whether that opinion is a reasonable one when it is not shared by the majority of your fellow jurors who have heard the same evidence. A juror should not hesitate if he or she finds themselves in the minority to reexamine their own views and change his or her opinion if convinced that it is erroneous.

"While I'm hopeful that these additional instructions will aid you in arriving at a unanimous verdict, let me assure you that it is not my intention to coerce you into a verdict as gratifying as it would be to all the parties concerned to have you reach an agreement you must not compromise your honestly held positions.

"Please retire now and continue with your deliberations. If you decide after reflection upon what I've just said, that a unanimous verdict still cannot be reached, then so advise me accordingly." (Emphasis added.)

store with Ms. C sometime on Friday, July 19, 1991, during her work shift.

The defendant testified to the following. While they were both in the loft area of the store, the defendant spontaneously kissed Ms. C. Although she mentioned to him that she had a boyfriend, she also told him that she was attracted to him. They resumed kissing and soon progressed to mutual sexual stimulation. Ms. C never resisted the defendant's advances and never said that she did not want to engage in sexual intercourse. Rather, Ms. C participated fully in the sexual activities and assisted in the removal of clothing. The sexual intercourse lasted approximately fifteen minutes. Thereafter, they both dressed. It is undisputed that the defendant then went into the back room of the store and slept.

Indeed, as the majority indicates, Ms. C testified that after the sexual intercourse she returned to the store area, reopened the store and made coffee. She did not telephone the police, nor did she tell anyone at that time that she was sexually assaulted. She followed her normal routine until she was relieved at the end of her shift by a fellow employee, Andrea Richards. Ms. C did not say anything regarding the incident to Richards, who testified that, when she arrived at the store at 6:40 a.m., Ms. C appeared normal, unruffled and unflustered, and that her conversation with Ms. C was not unusual. Ms. C said nothing about the incident to anyone during the weekend, including her sister, brother-in-law, room-mate and boyfriend.[2]

---

[2] If the state's case did not include testimony from several constancy of accusation witnesses, my analysis would not refer to Ms. C's silence. See *State* v. *Troupe*, 237 Conn. 284, 317, 677 A.2d 917 (1996) (*Berdon, J.,* concurring). In this case, however, the only witnesses who testified for the state, other than Ms. C, were constancy of accusation witnesses whose hearsay testimony concerned what Ms. C had told them four days after the event. Therefore, in the context of this case, it is relevant to discuss the evidence of Ms. C's silence and postincident reaction, which was elicited during her cross-examination.

The record indicates that it was not until the following Tuesday morning, after she had returned to work, that Ms. C first mentioned to state police officer Lucian St. Germain that she had a problem with her "boss." Their conversation was interrupted as a result of another customer coming into the store. That evening, another state police officer, Karl Golden, came into the store and asked Ms. C if the defendant had "touched" her. She replied that he had, and the conversation ended. On Wednesday, July 24, 1991, at approximately 4:30 a.m., Officer Peter Fernald of the Burlington police department came into the store and asked Ms. C "what was going on?" Ms. C was reluctant to discuss the matter. She testified that Fernald told her that the police would be unable to "do their job if [she] wasn't going to tell them everything." Fernald then asked Ms. C a series of questions, to which she responded either in the affirmative or in the negative, with little elaboration. When Fernald asked Ms. C if she had been raped, she replied: "I don't know." Ms. C testified that Terlecky then came into the store and spoke alone with her. During this conversation, Ms. C recounted what she claimed to be the facts of the entire incident.

Subsequently, Terlecky took Ms. C to the police station. From 6:15 a.m. to 10:20 a.m., she gave a five page written statement to Terlecky in which she accused the defendant of sexual assault. The first page and one quarter of Ms. C's statement discussed how Paul Senechal, a previous manager of the Cumberland Farms store, made sexual advances to her approximately ten days prior to the date of the incident with the defendant (Senechal portion of the statement). The defendant sought to cross-examine Ms. C and Terlecky on the Senechal portion of the statement. The state objected, claiming that such cross-examination was irrelevant, and the trial court sustained the objection.

I begin my analysis with a review of established federal constitutional principles relative to the right to cross-examine adverse witnesses. "The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Citation omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 248–49, 630 A.2d 577 (1993). "In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Lubesky*, [195 Conn. 475, 482, 488 A.2d 1239 (1985)]. *State* v. *Arline*, 223 Conn. 52, 60, 612 A.2d 755 (1992)." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 82 (1992).

Thirty years ago, this court emphasized the importance of allowing an accused wide latitude in his or her cross-examination in situations in which the only evidence that the accused had committed the crime, as in this case, is the testimony of the alleged victim. In *State* v. *Gionfriddo*, 154 Conn. 90, 96, 221 A.2d 851 (1966), the court held: "The defendant [has been] charged with crimes of the gravest character. Generally, the testimony of the [alleged victim] who claims to have

been assaulted is the principal and sometimes the only evidence of the commission of the crime. Therefore, a broad latitude on cross-examination must be allowed the defendant in order to test the veracity of the witness. *State* v. *Rivers*, 82 Conn. 454, 457, 74 A. 757 [1909]. In cases of this nature, in which there are seldom eyewitnesses, a denial of the right of cross-examination or undue interference by the court in the conduct of that examination may seriously curtail the legitimate and proper defense of one charged with the crime. It may not be abrogated or abridged at the discretion of the court to the prejudice of the cross-examining party. *State* v. *Luzzi*, 147 Conn. 40, 46, 156 A.2d 505 [1959]." Indeed, Justice Norcott underscored this fundamental principal when he wrote for a unanimous court that it "bears emphasis that any limitation on the impeachment of a key government witness is subject to the most rigorous appellate review." *State* v. *Colton*, supra, 227 Conn. 250. In the present case, Ms. C, who the defendant sought to cross-examine on her statement, was not only the key government witness, but was the state's *only* nonhearsay witness.[3]

Further, "[i]n determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 224 Conn. 331; *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986). "Although it is axiomatic that the scope of cross-examination generally rests within the discretion of the trial court, [t]he denial of all meaningful cross-examination into a legitimate area of inquiry fails to comport with

[3] The other witnesses were constancy of accusation witnesses. See *State* v. *Troupe*, 237 Conn. 284, 317–18, 677 A.2d 917 (*Berdon, J.*, concurring).

constitutional standards under the confrontation clause." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 331. In this case, the trial court prohibited any cross-examination concerning the Senechal portion of the victim's statement, on the grounds that is was not relevant, and thus foreclosed any inquiry regarding the reasons for including material, which described recent sexual advances made by a third party, in the statement in which she accused the defendant of sexual assault. See *State* v. *Milum*, 197 Conn. 602, 609, 500 A.2d 555 (1985) (cross-examination into certain matters may provide jury with "significant information to aid in assessing the bias, motive, interest and prejudice of the victim").

The majority justifies the trial court's ruling on the ground that it has "*wide discretion* to determine the relevancy of evidence and the scope of cross-examination."[4] (Emphasis added.) This discretion that the majority attributes to the trial court stands the sixth amendment to the United States constitution on its head. Indeed, we have held that the trial court's "discretion arises . . . *only after* the defendant has been permitted cross-examination . . . sufficient to satisfy the sixth amendment." (Emphasis added.) *State* v. *Colton*, supra, 227 Conn. 248; *State* v. *Vitale*, 197 Conn. 396, 402, 497 A.2d 956 (1985) (Justice Callahan, writing for a unanimous court, likewise echoed this same principle: "This discretion comes into play . . . only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment."); *State* v. *Castro*, 196 Conn. 421, 424, 493 A.2d 223 (1985) (same); *State* v. *Gaynor*, 182 Conn. 501, 508, 438 A.2d 749 (1980) (same).

Furthermore, until such time as the defendant's constitutional right to confrontation has been satisfied, the trial court has a narrow and clearly defined scope of

---

[4] The majority provides no authority for this novel statement.

discretion to determine the relevancy of evidence. " '[T]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and assessing the probative value of the direct testimony.' McCormick, Evidence (2d Ed.) § 29; see *Brown* v. *United States*, 409 A.2d 1093, 1099 (D.C. App. 1979) (rape case)." *State* v. *Ouellette*, 190 Conn. 84, 102, 459 A.2d 1005 (1983). Under these circumstances, any plausible basis put forth for such cross-examination satisfies the relevance requirement. See *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995).

In this case, the only contested issue is whether the admitted sexual activity was consensual or nonconsensual. The answer to this question hinges on the credibility of Ms. C as opposed to the credibility of the defendant. The defendant sought to cross-examine Ms. C on the Senechal portion of her statement not only because it was part of her statement accusing him of sexual assault, but also because it might have revealed a motive for accusing him of the assault. The defendant sought to show that, after Ms. C thought for several days about her conduct with the defendant and the recent sexual advances allegedly made by Senechal, she was motivated to claim that she was sexually assaulted because of her fear that, among other things, she might be thought of as a promiscuous woman by the managers.

The defendant satisfied his burden of establishing the relevance of the Senechal portion of the statement; see id., 747; when he argued vigorously to the court his good faith belief that there was an adequate relevant basis for his inquiry.[5] See *United States* v. *Peterson*, 808

[5] The following colloquy took place with respect to the relevance of the Senechal portion of the statement during the defendant's cross-examination of Ms. C:

F.2d 969, 978 (2d Cir. 1987); *State* v. *Barnes*, supra, 232 Conn. 747; 1 C. McCormick, Evidence (4th Ed. 1992)

"[Martin Zeldis, Defense Counsel]: Didn't you have a problem with Mr. Senechal very similar to the kind of problem—

"[Dennis O'Connor, State's Attorney]: Objection—

"Mr. Zeldis: That you had here?

"Mr. O'Connor: Objection.

"The Court: Alright. Hold on. Don't answer the question. [The jury was then excused.]

\* \* \*

"Mr. O'Connor: I object on three grounds based upon the way that the question is phrased, it's irrelevant. It violates the rape shield law. And finally, and most importantly, it far exceeds the scope of the direct examination. [The rape shield law justification was not pursued on appeal.]

\* \* \*

"The Court: Do you want to be heard?

"Mr. Zeldis: First of all, I don't believe that it violates the rape shield. I'm not looking for anything to do with her prior sexual history. But, I would imagine, and I would maintain that an event or an incident with a former manager, he's the current manager, an incident with a former manager, and an incident that's similar in nature to the accusation being made here, is extraordinarily relevant to the question of whether or not there's any transference of any beefs or any problems that she had with Mr. Senechal, or any problems that she has with [the defendant].

"Now, I would note that, Your Honor, for Your Honor, that in her statement, that in Ms. C's statement, that she made, she spends the whole first page and one half of her statement before she even mentions [the defendant's] name. She spends the whole first page and one half of the statement relating another incident that happened with her and the former manager at about a time that was very close in time. It wasn't a time, apparently, when he was the manager. It was at a time that was very close to the time that this allegedly happened.

"So, I think that it is—

"The Court: How is that going to assist the trier of fact if they know?

"Mr. Zeldis: Because, I—

"The Court:—And explain to me your theory of transference?

"Mr. Zeldis: Our defense is that this is a consensual act; and she was three to four days, by her testimony, in reporting in any way the nature of the alleged offense.

"Our contention in part is, and our defense is in this case, that it is consensual sex. It only became nonconsensual sex in her mind, in the victim's mind, as she started considering how she was being abused by managers or former managers, or how she was being treated by managers or former managers of Cumberland Farms. And that does have an impact on whether or not initially at the time that this all happened, it was a consensual act.

## § 49, p. 187. Despite its stated good faith belief of a motive that involved the alleged incident with Senechal,

"So, I think, that in that respect it is very important because from all appearances, and we are going to be presenting testimony, or we intend to present testimony, from all, and the testimony that is here right now, from all appearances, she went about her business after this happened. And it was several days before they observed, some police officers observed, that she seemed to be upset, and then, eventually, she came to tell the story that she did from the stand.

"Now, our belief is that this impacts what happened between [Ms. C.] and Mr. Senechal, impacts on whether or not what happened between her and [the defendant] is in fact consensual. It is important that the jury hear the full scope of what's going on. And again, for whatever the reason, she—when she gives her statement about the events of July 20, 1991, spends the first page and one half about what she's relating, not about [the defendant], but her experience with Mr. Senechal, who, I might add, she had experiences with doing the waxing and the washing of the similar types of experience to the one that [the defendant] is doing at the time that this allegedly happened.

\* \* \*

"Mr. Zeldis: It's really not about [Ms. C's] sexual history. It's about advances that were made, apparently, of a sexual nature, but not about the sexual history and her saying no, and her having the ability to say no. That also is relevant and important.

"The Court: Just so I understand your theory of transference, are you saying that there's a third party that may have committed this act and not—and someone other than the defendant?

"Mr. Zeldis: Oh, no. I'm not saying that. . . . Although, what I am saying is that the question as to whether or not this is a consensual act, and I—well, we've gone a long ways anyways; whether or not this is a consensual act has to do with a—has to do as much with what happened between Mr. Senechal and this victim, and what happened with [the defendant] and this witness.

\* \* \*

"The Court: I have a problem with your first issue about relevancy. How is that going to assist the trial? What if de facto, Mr. Senechal made advances?

\* \* \*

"Mr. Zeldis: My response is that there is a link here and the link is, to me, quite clear. It's not a matter of has this event happened a long time ago, and the question is consent. . . . [There followed verbal fumbling and a request that the witness be excused.]

\* \* \*

"Mr. Zeldis: The question of consent as a perceptual question is going to [be] something that the jury is going to struggle with in deciding. And how you decide, whose perceptions are true perceptions, and whose perceptions are not true perceptions is going to be by hearing evidence surrounding

the trial court did not allow any cross-examination on this important issue.

The majority appears to have confused the methods by which a defendant may establish the relevance of

this. People who saw this witness afterwards. People who had contact with this witness before. And one of the things, especially since she ordained it to be the most important thing is that she said first off what had happened with the former manager, I think, that it is probable that some of her problem with [the defendant] perhaps is really a problem with Mr. Senechal. And that the question of whether or not what happened between [the defendant] and the witness, and the question of whether it was consensual or not is impacted upon her beliefs.

"Now, if she felt—my goodness, this is what happens to me, I get taken advantage of by Cumberland Farms store managers. A new guy comes on, he's not different than the old guy. I give him sex and then he goes away, and he doesn't want anything to do with me . . . . That's going through her head.

"The Court: But where does Mr. Senechal fit in?

"Mr. Zeldis: Mr. Senechal fits in because after—after the sexual intercourse between [the defendant] and the witness, afterwards—afterwards she spends four days before she decides, as a matter of fact, two and one-half days out, she says to the officer she testified to, 'I don't know if it was a rape.' Two and one-half days out, she's still saying, 'I don't know if it was a rape.'

"What I'm saying is that it is possible, if not probable, that what she was doing was stewing for three or four days about what happened to her with [the defendant]. It wasn't a nonconsensual act at the time that it happened. It became a nonconsensual act as she stewed about it and thought—hey this is a pattern. The pattern is the same as it was before. I got a new manager. I got the same kind of situation coming up, and I don't know if I'm real comfortable with it. That isn't rape though. That is a consensual act that later on she decides is a nonconsensual act. . . . Letting me get into that entails letting me get into what was going on in her mind, and that would include, I submit, the very recent act, or activity, that she had with Mr. Senechal, which is not a sexual act.

"Now, as a matter of fact, it really gets almost no place. But it could certainly be construed by the person who it's happening to as a sexual type advance.

\* \* \*

"The Court: . . . I don't see the relevancy.

"I understand Mr. Zeldis' argument, but I don't see the relevancy for the jury in this particular case under what has been proffered.

"So, I'm going to sustain the objection to the question. You may have an exception.

"Mr. Zeldis: My exception is noted. Might I just inquire. So what Your

the offered testimony. As stated in *State* v. *Barnes,* supra, 232 Conn. 747, three methods are available for establishing the relevance of cross-examination: (1) the defendant may make an offer of proof; (2) the record may independently establish the relevance of the proffered testimony; or (3) the defendant may state "a 'good faith belief' that there is an adequate factual basis for his inquiry." I agree with the majority that "the defendant could not establish the relevance of the proposed cross-examination simply by stating that he had a 'good faith belief' that there was an adequate factual basis for the inquiry," without stating the basis of that belief. Counsel for the defendant, however, did not merely state that he had a good faith belief; he articulated a rational basis for that belief to the trial court. See footnote 5 of this dissent. The majority now holds, contrary to *Barnes* and other precedent,[6] that "it was incumbent upon the defendant to make an *offer of proof* of some kind demonstrating the relevance of the incident with the former manager." (Emphasis added.) The majority suggests that, in this case, a voir dire of either Ms. C or Terlecky was required. This additional requirement effectively eliminates the third *Barnes* alternative, the

Honor is saying is that at least as to anything that is dealing with this particular incident, I'm not going to be allowed to question the witness regarding that particular incident. I'm referring to the incident with Paul Senechal?

"The Court: Correct.

"Mr. Zeldis: As in her statement?

"The Court: I just want to make sure that we're talking about the same thing. Any prior interaction she may, or may have not had, with Mr. Senechal I'm not going to—I don't think that that's relevant.

"Mr. Zeldis: Correct. And that includes what she relates in her statement in the first page—the first page and one quarter regarding the incident two weeks before her statement.

"The Court: Correct."

[6] The majority opinion is inconsistent. In its opinion, the majority first states that "the defendant can establish a proper foundation for the testimony by stating a 'good faith belief' that there is an adequate factual basis for his inquiry," but later appears to recant that statement.

method upon which the defendant understandably relied.[7] Moreover, by suggesting that it was necessary to voir dire Ms. C or Terlecky in order to establish the relevance of a cross-examination concerning the Senechal portion of the statement, the majority deprives the defendant of his right to conduct an effective cross-examination. This sort of dress rehearsal outside the presence of the jury denies the defendant the spontaneity that is essential to cross-examine an adverse witness effectively, especially when the witness' credibility is being challenged.

Furthermore, as part of the same statement given to the police accusing the defendant of sexual assault, the Senechal portion of the statement clearly satisfies the second *Barnes* alternative for establishing relevance. The majority, however, is "unconvinced that the cognitive link between the two incidents is so apparent from the victim's statement that its relevance could be established without any further offer of proof." The Senechal portion of the statement must have been considered by Ms. C to be relevant and related to her encounter with the defendant, because she included it in her accusatory statement to the police. Additionally, the police must have thought that the Senechal portion of the statement was relevant because it was included in the statement accusing the defendant of committing sexual assault that they had prepared for Ms. C to sign.

The state dismisses the relevance of this inquiry, because, as the majority notes, the cross-examination

---

[7] It has been my experience as a trial judge that when this court's rulings are inconsistent, thereby creating confusion within the administration of a trial, the rights of the accused suffer. It is incumbent upon this court to make clear if, in this opinion, it is overruling *Barnes*—that is, counsel's "good faith belief" is no longer adequate to establish relevance for his or her inquiry. Further, the court should state what it means by an "offer of proof." *State* v. *Tillman*, 220 Conn. 487, 511, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992) (*Berdon, J.*, dissenting).

of Terlecky would have established that she, and not Ms. C, "was responsible for the structure of the statement." This argument fails to answer the question before this court, for it addresses only the location of the Senechal discussion within Ms. C's statement, and does not address the substance of that portion of the statement. Moreover, cross-examination of Terlecky on this point should have been allowed in order to ascertain why she thought it was relevant to include a discussion of the Senechal incident in a statement charging the defendant with a crime.

In short, the presence of the Senechal portion of the statement is the most obvious indicator of its relevance. As a matter of law, the defendant should be entitled to cross-examine on the entire statement accusing him of the crime. I also note that defense counsel's extensive argument clearly sets forth his good faith belief and constitutes an adequate offer of proof upon which the trial court should have allowed the defendant to pursue his cross-examination.[8]

The state cannot show that this denial of the defendant's federal constitutional right to confrontation was harmless beyond a reasonable doubt. "The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State* v. *Milner*, 206 Conn. 512, 529, 539 A.2d 80 (1988). Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or con-

---

[8] See footnote 7 of this dissent.

tradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *State* v. *Milner*, supra, 529; *State* v. *Oehman*, [212 Conn. 325, 332, 562 A.2d 493 (1989)]. Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. *State* v. *Ortiz*, 198 Conn. 220, 225, 502 A.2d 400 (1985)." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 224 Conn. 333.

In *Santiago*, we held that "the trial court's limitation of the defendant's cross-examination of [a witness] was not harmless beyond a reasonable doubt" where, as a key witness for the prosecution, the witness' testimony provided the only evidence from an individual who was not involved in the confrontation directly implicating the defendant, and the physical evidence was no more corroborative of the witness' testimony than that of the defendant's explanation. Id., 333–34.

In this case, Ms. C was not only a key witness for the prosecution, but, as I have previously mentioned, she was the only nonhearsay witness. The jury deliberated on this case for three days. On the second day it informed the court: "The jury appears to be at an impasse-deadlock with no apparent possibility for a unanimous decision at this juncture. We seek advice, consultation, etc., for the next step that should be taken." The court excused the jury for the evening and, on the next day, gave the Chip Smith instruction. Following this instruction, the jury requested a copy of the statutes pertaining to the two counts of the complaint and, later, requested to rehear a portion of Ms. C's testimony. Only then was the jury able to reach a unanimous verdict of guilty on both counts charged. This is hardly a case where the evidence before the jury was so overwhelming that the constitutional violation of the defendant's right to cross-examine Ms. C and Terlecky

as to the Senechal portion of the statement was harmless beyond a reasonable doubt. The impact of the Senechal portion on the trier of fact may very well have affected the result of the trial.

Accordingly, I dissent.