******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

*Syllabus*

Convicted of the crime of sexual assault in the fourth degree, the defendant appealed to this court. He claimed, inter alia, that certain of the trial court's evidentiary rulings violated his constitutional right to confront his accuser and to present a defense. *Held*:

1. The trial court did not abuse its discretion by precluding the defendant from cross-examining the complainant with respect to her mental state or psychiatric history, it properly having determined that the complainant's testimony that she had ingested some medication for anxiety that had been prescribed by a physician prior to her testimony in court was not a sufficient foundation for further inquiry, in the presence of the jury, into whether she was under the care of a psychiatrist: it was apparent that defense counsel, who based the inquiry on the complainant's demeanor while testifying, did not know or have a good faith belief that the complainant was under the care of a psychiatrist or that she had been diagnosed with a psychiatric condition that could affect her ability to perceive or recall the events at issue and to relate them to the jury accurately, and defense counsel's personal observations of the complainant were insufficient to support further inquiry; moreover, the court permitted defense counsel to ask the complainant whether she ingested any medication prior to going to court that day, the court sustained the state's objection to the cross-examination only with respect to defense counsel's inquiry as to whether the complainant's medication had been prescribed by a psychiatrist, and defense counsel did not ask the complainant whether she ingested any medication on or before the date of the incident at issue, whether it affected her ability to perceive the events at issue or impacted her ability to recall or narrate them, which might have provided a sufficient basis to warrant additional inquiry, and although the court heard argument with respect to the state's objection outside the presence of the jury where the possibility of questioning the complainant outside the jury's presence was raised, defense counsel never asked the court to conduct any such inquiry and never made an offer of proof on the issue.

2. The trial court violated the defendant's sixth amendment right to present a defense and to confront his accuser when it prohibited him from presenting evidence purporting to show that the complainant had solicited a bribe from the defendant's wife, H: H's proffered testimony, which demonstrated that H had observed the complainant at the place of employment where H worked with her daughter and that the complainant had made statements to H referring to H's husband and to the sum of $40,000, when viewed in light of the circumstances revealed by the evidence as a whole, provided a reasonable basis for the jury to infer that the complainant attempted to solicit money from H, and although H's testimony lacked clarity and completeness in some respects, H was unwavering in her testimony that, during her brief encounter with the complainant, the complainant referred to her husband and to the sum of $40,000; moreover, H also testified to previous encounters with the complainant at H's place of employment in which the complainant behaved in a weird manner, and to having reported the complainant's prior conduct to the police, which supported an inference that the complainant's conduct was viewed to be legally questionable, the trial court was not entitled to exclude the evidence simply because it did not consider it to be persuasive, as the weight to be afforded the evidence is a question for the jury, the proffered testimony was relevant to an assessment of the complainant, the state's key witness, concerning the events at issue, and the inference that the defendant wanted to invite the jury to draw from the evidence was not so unreasonable as to warrant its exclusion; accordingly, because the proffered testimony likely would have changed the outcome of the trial if the jury had credited the testimony and inferred that it was evidence that the complainant had

solicited a bribe from a member of the defendant's family, the state could not demonstrate that the trial court's ruling was harmless beyond a reasonable doubt and a new trial was warranted.

3. This court declined to consider the merits of the defendant's claim that the trial court improperly admitted evidence of the complainant's demeanor after she made an initial complaint to the police, which was based on his claim, raised for the first time on appeal, that the court improperly failed to analyze the admissibility of the evidence under the constancy of accusation doctrine, the defendant having failed to raise that argument before the trial court at the time that he objected to the admissibility of the evidence on the ground of relevance.

Argued April 12—officially released August 29, 2017

*Procedural History*

Substitute information charging the defendant with the crime of sexual assault in the fourth degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Hudock, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed; new trial.*

*John R. Williams*, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Nadia C. Prinz*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Skender Halili, appeals from the judgment of conviction, following a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a. The defendant claims that the trial court (1) violated his sixth amendment right to confront his accuser when it prohibited him from cross-examining the complainant[1] with respect to her mental state or psychiatric history, (2) violated his sixth amendment right to present a defense and confront his accuser when it prohibited him from presenting evidence purporting to show that the complainant had solicited a bribe from the defendant's wife, and (3) improperly admitted evidence of the complainant's demeanor after she made an initial complaint to the police. We agree with the defendant's second claim. Accordingly, we reverse the judgment of the trial court and remand the case to the court for a new trial.

At trial, the state presented evidence in support of the following alleged version of events. At times relevant, the defendant and the female complainant were neighbors in a New Canaan condominium complex. The defendant is an Albanian national who has a green card and speaks with an Albanian accent. On April 9, 2014, the complainant and her father were standing near the complainant's automobile in the parking lot of the complex while attempting to resolve a mechanical issue. On prior occasions, the complainant observed the defendant performing work on automobiles at the complex. The defendant approached the complainant and her father, stated that he was experienced in repairing automobiles, and offered to repair the automobile, even if this meant that he had to pay for the repairs himself.

After the complainant's father left the scene, the defendant accompanied the complainant as she took the automobile for a test drive so that the defendant could hear the sounds that the automobile made while it was being operated on the road. During the test drive, the complainant conversed with the defendant and "[f]or the most part" understood what he was saying to her despite his accent. Following the test drive, which was uneventful, the defendant and the complainant agreed that, the following day, he would bring his automobile ramps to the complainant's residence so that he could further inspect her automobile.

Shortly before 10 a.m. on April 10, 2014, the defendant arrived at the complainant's residence and utilized the ramps to inspect her automobile. Thereafter, he entered the complainant's residence and washed his hands in the bathroom. The complainant took the defendant for another test drive in the automobile.

At the beginning of the test drive, the defendant offered the complainant a piece of chewing gum. When the complainant accepted, the defendant attempted to

insert the gum into her mouth while she was operating the automobile. The complainant told him not to do so. The complainant testified that the defendant's "weirdness" continued to escalate during the remainder of the test drive. The defendant asked the complainant if she had a boyfriend, and she replied that she did. The complainant mentioned to the defendant that he was married, to which he replied, "that doesn't matter." While the complainant was driving on the Merritt Parkway, the defendant referred to the opera, "Madame Butterfly," unbuckled his safety belt, and opened the passenger door of the automobile while it was in motion. The defendant's sudden and unusual conduct frightened the complainant, and she was anxious to keep the automobile under control.

The defendant's actions became sexual in nature when he placed the open palm of his left hand on the complainant's right thigh while she continued to operate the automobile. The complainant asked the defendant repeatedly to remove his hand from her thigh. When he failed to comply, the complainant pushed his hand away. This initiated a physical struggle between the complainant and the defendant. He quickly moved his hand between her legs and, with his extended fingers, began to exert pressure on the complainant's vagina over her clothing in what the complainant believed to be an effort to "stimulate" her. While the complainant continued to drive, she tried to prevent the defendant from touching her. At one point in time, the complainant used her elbow to strike the defendant's body and, in so doing, caused the automobile to shift out of gear. Meanwhile, the defendant was snickering and making moaning sounds. At another point in time, the defendant lifted himself off of the passenger seat in what the complainant believed to be an effort to crawl on top of her. The defendant also tried to lift the complainant's shirt; he exposed and touched her bare skin. Toward the end of the approximately twenty minute ordeal, the complainant told the defendant that he was "going to get in a lot of trouble . . . ."

The complainant became aware that her automobile was running low on gasoline, but she drove to the New Canaan police station. She parked in front of the station, turned off the ignition, took her keys with her, and went inside to seek assistance. Meanwhile, the defendant exited the automobile and left the scene.

The complainant met with Officer Thomas Patten of the New Canaan Police Department, who interviewed her briefly. He asked her to complete a statement and to return it to him the following morning. The complainant complied with this request. Later that day, Patten visited with the complainant at her residence. At the condominium complex, Patten also spoke with the defendant. During this initial encounter with the police, the defendant denied having had any interaction with the com-

plainant that day.

On the following day, April 11, 2014, during a voluntary interview of the defendant at the New Canaan police station, Patten informed the defendant that the police had surveillance footage of the police department on April 10, 2014. In response, the defendant admitted that he was with the complainant on April 10, 2014, that he had provided assistance to her with her automobile, and that he had gone for a drive with her. Although, in their prior interactions with the defendant, the police officers who were investigating the incident had not raised the subject of inappropriate touching in the automobile, the defendant volunteered that nothing had happened in the automobile. He stated: "I did not touch." During the interview, the defendant stated to Sergeant Peter Condos of the New Canaan Police Department that, the previous day, he lied about his not having been with the complainant because he was scared. Additionally, the defendant stated that the complainant had not made any advances of a sexual nature toward him. The defendant acknowledged to the police that, although he felt "ashamed," he did not know why the complainant ended the test drive at the police department on April 10, 2014.

The jury found the defendant guilty of sexual assault in the fourth degree. The court sentenced the defendant to a term of incarceration of one year, execution suspended after thirty days, followed by two years of probation.[2] Additional facts will be set forth as necessary in the context of the defendant's claims.

I

First, the defendant claims that the court violated his sixth amendment right to confront his accuser when it prohibited him from cross-examining the complainant with respect to her mental state or psychiatric history. We disagree.

The following additional facts are relevant to the present claim. During the state's direct examination of the complainant, she related her account of the events at issue. At the conclusion of her direct examination, the prosecutor asked the complainant about her emotional state while testifying. The complainant replied that she felt "[e]xtremely uncomfortable . . . [b]ecause this is not a place I want to be." During the defendant's cross-examination of the complainant, defense counsel asked the complainant, "have you taken any kind of medications prior to coming here to court today?" After the court overruled the state's objection to the inquiry, the complainant answered: "Yes."

The following examination of the complainant by defense counsel then transpired:

"Q. What have you taken?

"A. I took a—last night I took a—something for

anxiety.

"Q. What type of medicine is that?

"A. I . . . don't know the name of it.

"Q. It's prescribed by your physician?

"A. Yes.

"Q. Is that physician a psychiatrist?"

At this point in the inquiry, the state objected on the ground of relevance. The court excused the jury and asked defense counsel to provide a good faith basis for his inquiry, and whether he was "on a fishing expedition . . . ."

Defense counsel explained: "I am basing [the inquiry] on the demeanor of the witness throughout her direct examination, which, in my experience, is beyond odd and not characteristic of any kind of behavior I've ever seen from a witness testifying as to such matters before.

"I think . . . that my suspicions were borne out when it was confirmed that she is taking medication that relate[s] to mental state, and I . . . it's apparent that she is indeed under psychiatric care, and I think that it is increasingly apparent that she suffers from some type of psychiatric condition. I believe that that is a fair line of inquiry, given the nature of this case, the fact that this case relies entirely on the accuracy of her recollections.

"I think that these questions have a basis to be asked, as I've indicated. And certainly they go to her ability to perceive, to remember and to relate accurately and truthfully.

"Quite frankly, Your Honor, when you combine with the wild disparities in the various versions she's given in this case, which we'll get to in due course, I think there's [a] very serious question about whether she is fantasizing."

After remarking that it was not bothered by the fact that even "extreme" disparities may be reflected in the complainant's versions of events, the court observed that it was "looking for . . . her ability to tell the truth . . . ."

The prosecutor objected to the line of inquiry on the ground that it was based on defense counsel's admission that he merely had suspicions concerning the complainant's mental state—suspicions that were based only on his own evaluation of the witness' demeanor in court. Suspicions, the prosecutor argued, did not amount to a good faith basis to warrant the inquiry.

Defense counsel responded that the prosecutor had an affirmative obligation to inquire about and disclose information about the complainant's prior psychiatric history, but that the prosecutor "has not indicated one way or the other in that respect." Thus, defense counsel

suggested that the prosecutor may be withholding exculpatory information concerning the complainant.

The prosecutor replied in relevant part: "I did inquire of [the complainant] whether she had ever been diagnosed with any psychiatric conditions, and she indicated, no. She did indicate to me that she had a learning disability that she sometimes talked to a therapist about. She did not indicate to me at that time that she was taking any medications. And I don't know, we could question her further, although I don't think it's appropriate, but it sounds to me like anxiety medication taken on the night before a trial is not a consistently prescribed or consistently taken medicine, and she did not in fact take anything this morning, which was her first answer to counsel's question. The fact that she took an anxiety pill before this testimony last night, I might have taken an anxiety pill before the testimony last night. I didn't in this case, but I don't see that I have any duty to disclose that or even to ask her about that."[3]

The prosecutor went on to state that anxiety was not a mental illness, to which defense counsel stated that "it is one of the psychiatric conditions contained in the Diagnostic and Statistical Manual [of Mental Disorders]."

The court sustained the state's objection to the inquiry. The court stated: "Up to this point, I've listened to the testimony of the witness. . . . [S]he has indicated that she is not comfortable. . . . [W]ithout anything further, counsel, I'm going to sustain the objection. . . . [T]he state has, in good faith, made inquiry. There's been no effort by the defendant to delve further [into] the issue of her psychiatric issues, if any.

"As far as I know, she took a pill because she had to testify the next day, and that's where it's going to stay unless you can give me something firmer other than it's just confirmed your suspicions."

Thereafter, the court summoned the jury to the courtroom and stated that it had sustained the state's objection. Defense counsel resumed his examination of the complainant. Defense counsel asked the complainant about her testimony that the defendant opened the door to her automobile while the automobile was being operated at highway speed, that she exited the highway but got back on so that she could travel in the opposite direction, that she did not stop for gasoline or to seek assistance prior to driving to the police station, and that she seemingly had difficulty relating relevant facts to the police when she arrived at the police station.[4] Defense counsel also inquired about the fact that it took the complainant five hours to complete her three page written statement and that she was late for her appointment to meet with Patten on April 11, 2014. Additionally, defense counsel asked the complainant to explain why she failed to tell the police initially that the defendant

had touched her vagina over her clothing. Defense counsel, however, did not inquire further into the complainant's psychiatric history or use of anxiety medication.

Before this court, the defendant argues that "[t]he court's complete prohibition, without even conducting the inquiry [into the complainant's use of anxiety medication] suggested by the prosecution, of any cross-examination of the complainant regarding her acknowledged, ongoing psychiatric condition, clearly violated [his] sixth amendment right of confrontation." The defendant argues that "the court flatly prohibited any inquiry whatsoever into an obvious issue in the case, which was crucial to the defense"—precluding even an inquiry outside of the presence of the jury—and that its ruling was so prejudicial as to warrant a new trial. The state counters these arguments by arguing that defense counsel, by failing to lay a proper foundation for the inquiry, failed to demonstrate that the inquiry was likely to yield relevant evidence. Thus, the state maintains, the court properly exercised its discretion to disallow the inquiry. Alternatively, the state argues that the defendant is unable to demonstrate that a constitutional violation exists because the defendant was afforded an ample opportunity to expose facts from which the jury could assess the reliability of the complainant's testimony, and any error by the court was harmless beyond a reasonable doubt.

"[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . Further, the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense. . . .

"However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by

determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [Finally, the] proffering party bears the burden of establishing the relevance of the offered testimony. . . .

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial [court] . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . . The defendant's right to cross-examine a witness, however, is not absolute. . . . Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . ." (Internal quotation marks omitted.) *State* v. *Leconte*, 320 Conn. 500, 510–12, 131 A.3d 1132 (2016).

"It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility." (Internal quotation marks omitted.) *State* v. *Santos*, 318 Conn. 412, 424, 121 A.3d 697 (2015); *State* v. *Slimskey*, 257 Conn. 842, 853–54, 779 A.2d 723 (2001) (same). Thus, a defendant has a constitutional right to attempt to cast doubt on a witness' testimony by demonstrating that his or her sense of perception or ability to recall material events is suspect. See *State* v. *Esposito*, 192 Conn. 166, 176, 471 A.2d 949 (1984) ("[t]he capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination"); *State* v. *Grant*, 89 Conn. App. 635, 641, 874 A.2d 330, cert. denied, 275 Conn. 903, 882 A.2d 678 (2005) (same).

"The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. . . . Relevance may be established in one of three ways. First, the proffering party can make an offer of proof. . . . Second, the record can itself be adequate to establish the relevance of the proffered testimony. . . . Third, the proffering party can establish a proper foundation for the testimony by stating a good faith belief that there is an adequate factual basis for his or her inquiry." (Citation omitted; internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 586, 678 A.2d 924 (1996); see also *State* v. *Benedict*, 313 Conn. 494, 511, 98 A.3d 42 (2014) (same).

In evaluating a claim of this nature, "[w]e first review the trial court's evidentiary rulings, if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail. . . . If, however, we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment, including cross-examination, [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . ." (Internal quotation marks omitted.) *State* v. *David N.J.*, 301 Conn. 122, 133, 19 A.3d 646 (2011). In evaluating the severity of the limitations, if any, improperly imposed on the defendant's right to confront, and thus impeach, a witness, "[w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Leconte*, supra, 320 Conn. 512. In conducting our analysis, we are mindful that "trial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [W]e have upheld restrictions on the scope of cross-examination where the defendant's allegations of witness bias lack any apparent factual foundation and thus appear to be mere fishing expeditions." (Internal quotation marks omitted.) *State* v. *Jordan*, 305 Conn. 1, 28, 44 A.3d 794 (2012). We consider de novo whether a constitutional violation occurred. See, e.g., *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013); *State* v. *Abernathy*, 72 Conn. App. 831, 837, 806 A.2d 1139, cert. denied, 262 Conn. 924, 814 A.2d 379 (2002).

The court's ruling does not reflect that it misunder-

stood the applicable legal principles. The court appears to have agreed with the prosecutor's arguments that the complainant's testimony—that in the hours prior to her appearance in court she ingested "something for anxiety" that had been prescribed by a physician—was not a sufficient foundation for a further inquiry in the presence of the jury into whether the complainant was under the care of a psychiatrist. We agree with the court's determination that the complainant's testimony constituted an insufficient foundation from which to pursue the line of inquiry.

In the present case, the complainant testified that, the night prior to her testimony, she ingested medication that had been prescribed for her by a physician to treat anxiety. Then, the state objected to defense counsel's inquiry as to whether the prescribing physician was *a psychiatrist.* The victim's testimony, without more, did not provide a sufficient factual foundation for this further inquiry. During argument outside of the presence of the jury, defense counsel represented that he based the inquiry on the complainant's demeanor while testifying. It is apparent that defense counsel did not know or have a good faith belief that the complainant was under the care of a psychiatrist or, more significantly, that she had been diagnosed with a psychiatric condition that could affect her ability accurately to perceive the events of April 10, 2014, to recall those events, and to relate them to the jury. His personal observations of the complainant were insufficient. In the absence of adequate support for the inquiry in the record, a good faith belief by defense counsel, or a sufficient proffer to support the further inquiry, the court did not abuse its discretion in precluding the inquiry. See *State* v. *Beliveau*, supra, 237 Conn. 586 (discussing methods of establishing relevance of proffered testimony).

Although the defendant argues that the court prevented him from conducting "any cross-examination of the complainant regarding her acknowledged, ongoing psychiatric condition," the record belies this sweeping assessment of the court's ruling. Over the state's objection, the court permitted defense counsel to ask the complainant whether she had ingested "any kind of medications prior to coming here to court today." The court sustained the state's objection to a specific topic: defense counsel's inquiry with respect to whether the complainant's medication had been prescribed by a psychiatrist. Although defense counsel argues that the court prevented him from inquiring into the complainant's "condition," the record reflects that defense counsel did not ask the complainant whether she had ingested the medication on or before April 10, 2014; whether it affected her ability to perceive events; or whether the medication she ingested prior to her testimony impacted her ability to recall or narrate the events at issue. The answers to these questions, which were never asked, might have provided a sufficient basis

in the evidence to warrant additional inquiry. Instead, following the complainant's admission that she ingested medication to treat anxiety, defense counsel immediately asked her whether the medication was prescribed by a psychiatrist.

Additionally, the defendant argues that the court's ruling was erroneous because it precluded any further inquiry outside of the presence of the jury. The court heard argument with respect to the state's objection outside of the presence of the jury, and, as the defendant observed before this court, at one point during such argument, the prosecutor referred to the possibility that the witness could be questioned outside of the jury's presence. Yet, defense counsel never asked the court for permission to conduct any inquiry of this nature or otherwise make an offer of proof with respect to this issue. The court afforded the prosecutor and defense counsel an ample opportunity to address the court with respect to the state's objection. To the extent that there was any ambiguity in the court's ruling as to whether the court was precluding the defendant from conducting an inquiry outside of the jury's presence, the record does not suggest that defense counsel was discouraged from asking the court to clarify the ruling. On the record before us, the defendant is unable to point to any evidence that the complainant suffered from a condition that negatively affected her ability to perceive, to recall, or to relate the events of April 10, 2014.

Because we conclude that the court properly excluded the defendant's inquiry, we reject his claim that the court's evidentiary ruling violated his rights under the sixth amendment.

## II

Next, the defendant claims that the court violated his sixth amendment right to present a defense and confront his accuser when it prohibited him from presenting evidence purporting to show that the complainant had solicited a bribe from the defendant's wife. We agree.

The following additional facts are relevant to the present claim. During the defendant's case-in-chief, the defense presented testimony from Flutura Halili,[5] the defendant's wife. Halili testified that she emigrated to the United States from Albania ten years earlier. Halili testified that she was comfortable speaking in English, but she asked to use an interpreter during her examination if it became necessary to do so. In relevant part, Halili testified that she and her daughter were employed at a CVS.[6] Halili testified that she worked on "the floor" and that her daughter worked in the pharmacy as a pharmacy technician. After the complainant reported the events underlying this action to the police, the complainant interacted with her and her daughter at CVS. Halili testified that the complainant "came around us"

many times and that the complainant "was . . . weird." Halili testified that, following these encounters at CVS, she and her daughter went to the police station to report these encounters to the police.

Defense counsel asked Halili whether the complainant made any "contact" with her, to which Halili began to refer to a specific incident that took place at CVS. The prosecutor objected to the inquiry on the ground of hearsay. The court excused the jury to hear argument on the matter. Outside of the presence of the jury, defense counsel made an offer of proof. Defense counsel asked, "what did [the complainant] say?" Halili testified: "She was talking over there, and I didn't realize her until I went there because she came in that place where I was working and she was talking about money, but she never put her head up. She was doing something, like, something she's doing, like by creams over there. She was watching over there, and she was saying something, the money, about money. When I walk there because always I walk away from her—in order not to be around her, but she came over there and she was talking something about my husband, but I don't know what she was talking. But she was talking about money first and my husband."

Defense counsel asked: "[D]id you have any understanding from what this woman said to you about your husband and about money; did you have any understanding that she was trying to get something from you?" Halili testified: "I think she was trying to get something from me. . . . I think she was talking just about to give her money. It's my point, because she came there many times and, that day, she came there just when I was alone over there."

Outside of the presence of the jury, the prosecutor conducted an examination of Halili, as follows:

"Q. Do you recall exactly what words she said?

"A. She was talking about money. She was saying something about forty thousand, something like that. And when I see her, she was saying something about husband, but I walk away always when she's there.

"Q. What did she say about forty thousand? She just said the words forty thousand or she said other words?

"A. She was talking, but when I there, she was saying those things.

"Q. But what was she saying about forty thousand?

"A. Just forty thousand. She was talking, but what I listen was forty thousand and something about my husband.

"Q. Did she . . . use any words around . . . did she just say the number forty thousand?

"A. No. She was saying other words, but I walk away from her.

"Q. But you don't know what those other words were?

"A. She was saying something about him.

"Q. So, she said some words about forty thousand?

"A. No. She was saying some words before forty thousand, and I went there, I saw her, and she said your husband, and I walk away from her.

"Q. So, the only words you can repeat for me today are husband and forty thousand?

"A. Yeah. She was talking more, but when went there and I walk right away because I saw it was her."

Defense counsel argued that "this is evidence from which a jury can find that [the complainant] was seeking . . . to be paid off in this case, and I think that that is certainly relevant to her credibility and, therefore, admissible evidence." Defense counsel argued that the testimony did not constitute hearsay because it was a verbal act and that the act was relevant to the jury's evaluation of the complainant's credibility. Defense counsel argued: "I think the court can take judicial notice that CVS does not sell anything for forty thousand dollars, and I think there's sufficient evidence here to allow this in."

The prosecutor argued that the testimony was not evidence of a verbal act because Halili was unsure what the complainant said. The prosecutor argued that defense counsel lacked a good faith basis for his argument. The prosecutor argued that Halili was unable to articulate what the complainant said, Halili worked at a business involving money transactions, the incident was not relevant to an understanding of the defendant's alleged criminal acts, and there was nothing in the proffered testimony that would reflect on the complainant's credibility. The prosecutor stated: "[A]t this point, I would indicate that . . . despite the fact [that] the witness is claiming that she had an understanding, that the only words she can repeat for us are forty thousand and husband. I think, for that reason, there was no understanding gleaned there, and despite whatever opinion this witness may have formed."

The court stated: "I'm still skeptical. . . . I'm going to sustain the objection just based upon the fact that we're talking a number, a large number, and we're talking that she mentioned a husband. It's so tenuous. Again, I have no connection between the two. I don't know what words were said in between. I can't put that in front of the jury in all good faith and allow them to do anything other than to speculate as to what this conversation was about. I can't do that." Thereafter, the jury was summoned to the courtroom, and defense counsel indicated that he had no additional questions for the witness. Thus, the court appears to have agreed with the state that Halili's testimony lacked sufficient clarity to be considered evidence of the verbal act for

which it was offered, specifically, that the complainant attempted to be paid off by Halili.

On appeal, the defendant argues: "The right of a defendant in a criminal trial to present evidence of bias or improper motivation on the part of a prosecution witness is protected by the confrontation clause of the sixth amendment. . . . Certainly, evidence that the complaining witness had sought a $40,000 payment from the defendant's wife after she had filed her criminal complaint but before she testified at trial, and that the solicitation had been rebuffed, was evidence of [her] bias and motive well within the parameters of sixth amendment protection. Such evidence is material and not collateral, and may be presented through extrinsic evidence, as the defendant attempted to do in this case." (Citation omitted.) The defendant acknowledges that the testimonial evidence at issue was circumstantial in nature, subject to more than one interpretation, and, therefore, did not fall into the category of " 'smoking gun' " evidence. Yet, the defendant argues, the jury reasonably could have drawn inferences from the evidence and found that the alleged verbal act occurred.

The state appears to agree with the defendant that if, in fact, the defendant proffered evidence that the complainant solicited a bribe, such evidence is relevant impeachment evidence. Rather, as it did at trial, the state argues that the evidence "was far too speculative to establish that [the complainant] solicited a bribe from Flutura Halili, and . . . [was] not relevant to [an evaluation of the complainant's] credibility." The state argues: "Putting aside [Halili's] conclusory and self-serving conjecture that [the complainant] was asking for money, the facts that she testified to—that [the complainant] uttered the words 'money,' 'forty thousand,' and 'your husband,' amidst other unknown words—was far too vague to support the inference that [the complainant] was soliciting a bribe. In other words, the inferences that the defendant suggests were not supported by the proffer. This lack of connection between the words uttered and their proffered purpose made their admission 'not worthy or safe' to prove that [the complainant] had a motive or bias to be untruthful."

The principles set forth in part I of this opinion, related to an accused's right to confront the witnesses against him, also apply to our analysis of the present claim. The sixth amendment guarantees the right to present facts to the jury that are relevant to an assessment of a witness' credibility and, in particular, his or her "motive, bias and interest. . . . Further, the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense." (Internal quotation marks omitted.) *State* v. *Leconte*, supra, 320 Conn. 510. "In plain terms, the defendant's right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the

jury so that it may decide where the truth lies. . . . It guarantees the right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 817, 135 A.3d 1 (2016). "A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence should not be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . The trial court retains the power to rule on the admissibility of evidence pursuant to traditional evidentiary standards." (Citation omitted; internal quotation marks omitted.) *State* v. *Romanko*, 313 Conn. 140, 147–48, 96 A.3d 518 (2014).

The parties appear to agree that, if the evidence demonstrated that the complainant solicited a bribe from Halili, it would be admissible as a verbal act that was relevant to an assessment of the credibility of the state's key witness, the complainant. "A verbal act is an out-of-court statement that causes certain legal consequences, or, stated differently, it is an utterance to which the law attaches duties and liabilities . . . [and] is admissible nonhearsay because it is not being offered for the truth of the facts contained therein." (Internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 255, 856 A.2d 917 (2004). "Extrinsic evidence may be admitted . . . if the subject matter of the testimony is not collateral, that is, if it is relevant to a material issue in the case apart from its tendency to contradict the witness. . . . Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. . . . It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993); *State* v. *Erick L.*, 168 Conn. App. 386, 402, 147 A.3d 1053, cert. denied, 324 Conn. 901, 151 A.3d 1287 (2016); Conn. Code Evid. § 6-5. The claim may be distilled to the issue of whether the evidence was relevant simply because it tended to demonstrate the fact for which it was admitted.

" 'Relevant evidence' means evidence having any tendency to make the existence of the fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want

of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [A]buse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Martinez*, 171 Conn. App. 702, 726, 158 A.3d 373, cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017).

"Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Furthermore, [t]he fact that the [trier of fact] would have . . . to rely on inferences to make [a] determination does not preclude the admission of . . . evidence. . . . The trial court [however] properly could [exclude] evidence where the connection between the inference and the fact sought to be established was so tenuous as to require the [trier of fact] to engage in sheer speculation. . . . Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience." (Citations omitted; internal quotation marks omitted.) *Masse* v. *Perez*, 139 Conn. App. 794, 805–806, 58 A.3d 273 (2012), cert. denied, 308 Conn. 905, 61 A.3d 1098 (2013).

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000).

At the outset of our analysis of the testimony at issue, we observe that, although Halili chose to testify without the aid of an interpreter, Halili's proficiency in English was not high. That her language skills were not strong does not necessarily lead us to conclude that her entire testimony was unintelligible or without probative value.

As the state recognizes, Halili testified before the jury with respect to several facts: (1) she and her daughter were employed at CVS; (2) on several occasions, the complainant encountered Halili and her daughter while they were working at CVS; (3) Halili considered the complainant's conduct on these occasions to be "weird"; and (4) Halili and her daughter brought the matter to the attention of the police. Outside of the presence of the jury, Halili testified with respect to several additional facts: (1) on the occasion at issue, Halili once again observed the complainant in CVS; (2) when Halili approached the complainant, and the two women were alone in the store, the complainant made statements; (3) in her statements, the complainant referred to the defendant ("your husband") and money, specifically, the sum of $40,000; and (4) when Halili recognized that it was the complainant who was speaking, she walked away.

Despite the fact that Halili did not provide further details about what the complainant said in her presence, her proffered testimony, when viewed in light of the circumstances revealed by the evidence as a whole, provided a reasonable basis for the jury to infer that the complainant attempted to solicit money from Halili. Although it lacked clarity and completeness in some respects, Halili was unwavering in her testimony that, during her brief encounter with the complainant in CVS, the complainant referred to her "husband" and "$40,000." The complainant made these statements while she and Halili were "alone" in a portion of the store, after she had encountered Halili and her daughter in the store and behaved in a "weird" manner on prior occasions, after she brought a police complaint against Halili's husband, and prior to her testimony at the trial. Halili testified that she and her daughter reported the complainant's prior conduct at their place of employment, CVS, to the police. This evidence reasonably supported an inference that Halili and her daughter at that time considered the complainant's conduct to be legally questionable. If Halili's testimony was credited, in light of the unique circumstances surrounding the encounter in CVS, it is difficult to conceive of an alternative explanation than that suggested by the defense for the fact that the complainant referred to the defendant and a specific sum of money during this encounter with the wife of the person who, according to her version of events, assaulted her sexually.[7] This, of course, does not mean that one does not exist.

Moreover, to the extent that Halili did not recall more specific statements by the complainant, in light of her language skills and her close relationship to the defendant, the jury reasonably could have considered that such lack of clarity in her testimony supported, rather than detracted from, a finding that Halili was testifying truthfully. And, we observe that it was not necessary that proof of such an illicit offer by the complainant

be unambiguous or formal. The jury reasonably could have concluded that the complainant, mindful of the impropriety of her offer and the risk that, in a public place, persons other than Halili may hear her statements, chose to remain deliberately vague until Halili indicated a willingness to discuss the matter further.

We are bound to look deferentially at the court's evidentiary ruling, and we recognize that, unlike this court, the trial court has a firsthand opportunity to observe witnesses. Although the state's objection to the testimony appears to have focused on a lack of completeness or clarity in Halili's testimony, the court did not find that the witness was incapable of remembering the events that she was asked to recall or that she was incapable of expressing herself before the jury without the aid of an interpreter.[8] Rather, the court expressed what appeared to be its own "skepticism" with respect to the testimony at issue, and stated that it was it was unable in its own mind to connect the reference to "money" and the reference to Halili's "husband." This suggests that the court simply did not find the evidence to be persuasive. The court is not entitled to exclude evidence simply because it does not consider it to be persuasive; the weight to be afforded the evidence is a question for the jury. As we have discussed, in light of the unique circumstances surrounding the complainant's statements, a jury reasonably could infer that these statements were made in an attempt to receive money from Halili in exchange for favorable treatment in the defendant's case. Stated otherwise, despite the fact that Halili was unable to testify in a more coherent manner concerning the statements made by the complainant, the defendant had the right to attempt to persuade the jury that the evidence nonetheless was proof of the illegal verbal act for which it was offered. The inference that the defendant wanted to invite the jury to draw from this evidence was not so unreasonable as to warrant its exclusion. Accordingly, we conclude that the proffered evidence was relevant and, therefore, admissible evidence that the court should have admitted at trial.

In connection with this claim, the state argues that the alleged constitutional violation did not occur because the court properly excluded the evidence on the ground that it was not relevant. The state, however, has not attempted to demonstrate that, if the court erroneously excluded the evidence, its ruling was harmless beyond a reasonable doubt. "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we

must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 649, 835 A.2d 895 (2003).

It suffices to observe that the state could not prevail in demonstrating that the court's erroneous ruling was harmless beyond a reasonable doubt. The proffered testimony was relevant to an assessment of the state's key witness, the complainant, concerning events that allegedly transpired when she was alone in an automobile with the defendant. The proffered testimony was not cumulative of any other evidence presented at trial, and although the defendant was afforded an ample opportunity to cross-examine the complainant, the cross-examination permitted did not cover this topic. Although the state presented evidence that corroborated the complainant's testimony in several respects, we are unable to conclude that the state's case was so strong that the evidence at issue would not likely have persuaded the jury in reaching its verdict. If the jury credited the testimony at issue and inferred that it was evidence that the complainant solicited a bribe from a member of the defendant's family, it likely would have changed the outcome of the trial.

In sum, the court erroneously precluded the defendant from presenting extrinsic evidence to demonstrate that the complainant was motivated to testify untruthfully. The exclusion infringed on the defendant's right to confront the complainant and present a defense. Accordingly, the defendant is entitled to a new trial.

III

Finally, the defendant argues that the court improperly admitted evidence of the complainant's demeanor after she made an initial complaint to the police. We decline to reach the merits of this claim.

The defendant argues that, over his objection at trial, the court permitted the state to present testimony from Louise Simpson, the complainant's neighbor, that, in the hours after she reported the incident to the police on April 10, 2014, the complainant appeared to be distraught. Specifically, the record reveals that Simpson testified that the complainant generally exhibited a calm demeanor but, later in the morning on April 10, 2014, her demeanor was different because she "was shaking . . . teary eyed and distraught." The record reflects that the defendant objected to the state's inquiry on the ground that it was irrelevant. The state argued that the evidence, which was based on Simpson's firsthand observations of the complainant, was relevant "because it goes to credibility." The court overruled the defendant's objection.

The defendant also argues that, over his objection at

trial, the court permitted the state to present testimony from M.N., the complainant's sister, that, at or around noon on April 10, 2014, she observed that the complainant "was sweating profusely . . . her eyes were open wide. She looked very scattered. She seemed frazzled, and I had asked her what happened. That was the first thing that came out of my mouth is, what happened." M.N. testified that the complainant and her aunt went shopping together that day. The record reveals that, when the state inquired about the complainant's demeanor that day, the defendant objected on the ground that the evidence was irrelevant.

On appeal, the defendant argues that the court's rulings were improper because the court failed to analyze the admissibility of the evidence under the constancy of accusation doctrine. The defendant argues that "[a]fter the formal police complaint has been lodged . . . demeanor is increasingly suspect as probative evidence and, since it cannot be cross-examined, must be subject to the same sort of rational limitations which have been imposed upon constancy of accusation evidence." The defendant argues that the evidence at issue was "highly suspect" and that the probative value of the evidence was "dubious at best . . . ."

Because the defendant failed to raise this unique argument before the court at the time that he objected to the admissibility of the evidence, but merely objected on the ground that the evidence was not relevant, we decline to consider the merits of the argument here. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013).

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

[2] Among the terms of probation were that the defendant (1) have no contact with the complainant or members of her family, (2) submit to sex offender and mental health treatment, (3) seek and maintain full-time employment, and (4) abide by a ten year standing criminal protective order.

[3] Following the court's ruling, the prosecutor stated that, in light of the defendant's suggestion that a *Brady* type of violation had occurred; see *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963);

he wanted to put more representations on the record. The prosecutor stated: "I'd just like to indicate that I did ask the witness if she had ever been diagnosed with any psychiatric condition. She told me about the learning disability. We talked about what that meant for her. It in no way seemed exculpatory to me in any way. She indicated talking, processing information, telling stories, sometimes it was a little slower for her. And in my view, I did not think that rose to anything near a level . . . requiring disclosure . . . and that was . . . the extent of that conversation."

[4] For example, the following examination of the complainant by defense counsel took place:

"Q. [W]hen you got to the police station, you had a lot of trouble answering the questions . . . that Officer Patten asked you, didn't you?

"A. I don't remember that.

"Q. Isn't it true that you couldn't give him a coherent story and that it was for that reason that he said, well, take this form home and write it out and bring it back later?

"A. Incorrect."

[5] Hereinafter, we refer to Flutura Halili as Halili and to Skender Halili as the defendant.

[6] Following Flutura Halili's testimony, the defense presented testimony from Alemsha Halili, the daughter of Flutura Halili and the defendant. As relevant to the present claim, Alemsha Halili testified that she was employed part-time at CVS in New Canaan.

[7] Indeed, at the time of oral argument before this court, the state was unwilling to provide a possible alternative explanation for the complainant's alleged conduct at CVS.

[8] "A person may not testify if the court finds the person incapable of receiving correct sensory impressions, or of remembering such impressions, or of expressing himself or herself concerning the matter so as to be understood by the trier of fact either directly or through interpretation by one who can understand the person." Conn. Code Evid. § 6-3 (b).